**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. C 07-05459 MEJ |
| Plaintiff, | **ORDER DENYING CLAIMANT'S MOTION TO SUPPRESS EVIDENCE** |
| vs. | |
| APPROXIMATELY $52,000 IN UNITED STATES CURRENCY, *et al*., | |
| Defendants. | |
| USTANO K. McVEY, | |
| Claimant. | |

**I.  INTRODUCTION**

Pending before the Court is Claimant Ustano McVey's ("McVey") Motion to Suppress Evidence (Dkt. #21).  Plaintiff United States of America (the "Government") has filed an Opposition (Dkt. #38), to which McVey filed a Reply (Dkt. #41).  Additionally, both the Government and McVey have submitted Proposed Findings of Fact and Conclusions of Law.  (Dkt. ##48, 49.)  For the reasons set forth in this Order, the Court DENIES McVey's Motion.

/ / /

/ / /

/ / /

**II.  BACKGROUND**

On October 25, 2007, the Government initiated this action by filing a Complaint for

Forfeiture (Dkt.#1) against Defendant $39,000 in U.S. Currency ("the defendant currency").  Federal

agents seized the defendant currency during a search of McVey's suitcase at San Francisco

International Airport ("SFO") on May 22, 2007.  In this action, the Government seeks forfeiture of

the defendant currency, alleging that it was furnished or intended to be furnished in exchange for a

controlled substance, was the proceeds from the sale of a controlled substance, or was used or

intended to be used to facilitate a violation of the Controlled Substances Act, 21 U.S.C. § 801 *et seq.*

(Compl. at 1.)

On July 17, 2008, McVey filed the instant Motion to Suppress Evidence, seeking to exclude

all evidence obtained as a result of the search of his suitcase.  On October 14, 2008, the Court held

an evidentiary hearing on the Motion.  At the hearing, the Court heard testimony from Task Force

Agent Steve Maes ("Agent Maes"), Drug Enforcement Administration Special Agent Willie Byrd

("Agent Byrd"), and McVey.  Following the hearing, the Government and McVey each submitted

Proposed Findings of Fact an Conclusions of Law.  After careful consideration of the parties' briefs,

supporting declarations, witness testimony and exhibits presented at the evidentiary hearing, and the

Proposed Findings of Fact and Conclusions of Law, the Court now rules as follows.

**III.  FINDINGS OF FACT**

On May 22, 2007, at approximately 7:30 p.m., Agent Maes and Agent Byrd (collectively,

"the Agents") were at SFO in the area of Gate 46, Terminal 1, awaiting the arrival of Delta Airlines

Flight 69 from Atlanta.  The flight arrived around 7:35 p.m. at Gate C46.  McVey deplaned and

exited the jetway at Gate C46 carrying two shopping bags.  He then proceeded to the Delta Airlines

baggage claim area.  Because the checked bags from Flight 69 had not come onto the baggage

carousel, McVey exited to the outside ground transportation pick-up area to smoke a cigarette.  The

outside ground transportation area was a public space, with passengers waiting for taxis and other

transportation.

Agent Maes and Agent Byrd followed McVey from Gate C46 to the outside ground

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

1    transportation area.  At the time, Agent Maes and Agent Byrd were dressed in plain clothes and

2    although they were armed, they did not have their weapons visible.

3         McVey and the Agents offered differing testimony about their initial contact.  McVey

4    testified that while outside on the curb area, he asked Agent Maes if he had a light.  According to

5    McVey, Agent Maes responded that he and Agent Byrd were conducting random checks for "9-1-1,"

6    and asked, "do you mind if we check your bag."  The Agents, however, testified that after following

7    McVey outside, they approached him from behind and Agent Maes initiated contact with McVey.

8    Neither Agent Maes nor Agent Byrd testified that they made any statements relating to random

9    checks.  Rather, both agents testified that when they approached McVey, they identified themselves

10   as law enforcement agents, showed McVey their badges, and Agent Maes informed McVey that he

11   was not under arrest and he was free to go.  McVey, however, testified that neither Agent said that

12   he was free to go.[1]  Neither Agent told McVey that he was "free to end the encounter," nor did the

13   Agents read *Miranda* rights to McVey.  During this exchange, the Agents remained at a

14   conversational distance of three to five from McVey and spoke in a conversational tone of voice.

15        Agent Maes then asked McVey if they could talk to him.  It is undisputed that McVey agreed

16   to speak to the Agents.  Agent Maes proceeded to ask McVey for his identification and airline ticket.

17   McVey showed the Agents his driver's license and plane ticket.  Agent Maes asked McVey about

18   where he arrived from, how long he was away, and what he was doing there.  McVey responded that

19   he was coming from Atlanta and was there to sign a hip hop artist.  Agent Maes asked McVey if he

20   had ever been arrested.  McVey said no.[2]  Agent Maes also asked McVey whether he was carrying

21   any illegal narcotics or large sums of U.S. currency.  McVey said no.

22        At that point, Agent Maes asked McVey if Agent Byrd could search the shopping bags that

23

24        [1]Although Agent Maes's report, which he prepared from his memory  the day after his contact
     with McVey, does not indicate that he told McVey he was free to go, Agent Maes testified that he
25   recalls doing so.  Agent Byrd likewise testified that he recalls Agent Maes telling McVey that he was
     free to go during the initial contact with McVey, thereby corroborating Agent Maes's testimony.  The
26   Court therefore finds the Agents' testimony that Agent Maes informed McVey that he was free to leave
     credible.

27        [2]It is undisputed that McVey had previously been arrested.

28                                    Page 3 of  12

**United States District Court**
For the Northern District of California

1    he was holding.  It is undisputed that McVey said yes.  Agent Byrd proceeded to conduct a search of

2    the two bags.  He found two shoe boxes in each bag containing shoes.  Agent Byrd did not find any

3    narcotics or currency and returned the bags to McVey.

4         At this point, Agent Maes asked McVey whether he had any checked luggage.  McVey said

5    yes.  Both Agents testified that Agent Maes then asked McVey if Agent Byrd could conduct a search

6    of his checked bag, to which McVey responded, "Yes."[3]

7         McVey then proceeded back inside the baggage claim area to carousel 17 to retrieve his

8    checked bag.  Agent Maes and Agent Byrd followed McVey.  The area around the baggage carousel

9    was fairly crowded with passengers retrieving their bags.  At carousel 17, McVey retrieved a black,

10   American tourist, roll-type suitcase.  Because of the crowd around carousel 17, Agent Byrd

11   remained back, while Agent Maes stood near McVey.  Both Agent Maes and Agent Byrd testified

12   that, once McVey retrieved his luggage, Agent Maes asked McVey if the bag was his.  McVey

13   responded, "Yes."  Agent Maes confirmed that it was McVey's bag by looking at the baggage claim

14   ticket which was in McVey's name.  Both Agents testified that Agent Maes again asked if Agent

15   Byrd could search the bag.  McVey responded, "Yes."[4]  Agent Maes further testified that he asked

16   McVey if Agent Byrd could search his bag somewhere where it was not so crowded.  McVey agreed

17   and rolled his bag to an adjacent, empty baggage carousel (carousel 16), while Agent Maes and

18   Agent Byrd followed.  At carousel 16, McVey sat down on the carousel and handed his bag to Agent

19   Byrd.  It is undisputed that neither Agent Maes nor Agent Byrd told McVey that he was free to go or

20   end the encounter during this time.

21        At carousel 16, McVey handed his suitcase to Agent Byrd, who proceeded to search the bag.

22   Concurrently, Agent Maes asked McVey if he was carrying any narcotics or large sums of currency

23

---

24   [3]McVey testified that the Agents did not ask to search his bag until later in the encounter.  The Court, however, finds the Agents' testimony on this point credible.

25

26   [4]McVey testified that Agent Maes did not ask to search his bag at carousel 17, but first asked him to go to carousel 16 and then asked whether Agent Byrd could search his bag.  Agent Maes and Agent Byrd both testified that Agent Maes asked to search McVey's checked bag after he retrieved it

27   at carousel 16.

28                                Page 4 of  12

**United States District Court**
For the Northern District of California

1   in that bag.  McVey responded, "No."  McVey did not say anything regarding the search of the bag

2   or to "stop."  McVey then asked the Agents if he could use his cell phone.  After Agent Maes told

3   McVey that he could, McVey made a call, apparently to check his voicemail.  During the search of

4   the suitcase Agent Byrd discovered several pairs of old tennis shoes with raised insoles.  Agent Byrd

5   lifted up the insoles and discovered the defendant $39,000 in U.S. currency bundled.

6   Agent Maes then asked McVey where the currency came from.  McVey responded that he

7   did not want to say anything about it that could be used against him in court.  Both Agents testified

8   that Agent Maes again told McVey that he was not under arrest.  The Agents then removed the

9   currency from the bag and asked McVey how much it was.  McVey said that he did not want to say

10  anything.  The Agents then informed McVey that they were seizing the defendant currency and gave

11  McVey a receipt.  Approximately 15 minutes had passed from the time of their initial contact with

12  McVey until the time the Agents completed the search of McVey's suitcase.

13  The following day, on May 23, 2007, Agent Maes prepared a written report detailing the

14  incident.  Agent Maes's report does not indicate that he or Agent Byrd told McVey that he was free

15  to leave during their initial discussion with him on the curbside or during the search of his checked

16  luggage.  Agent Byrd did not take any notes of the encounter.  In preparing his Declaration in

17  Opposition to McVey's Motion to Suppress, Agent Byrd reviewed Agent Maes's report.

18  Agent Maes testified that he has participated in approximately 30 encounters.  Agent Byrd

19  testified that he has participated in approximately 20 to 30 airport encounters/interdictions since

20  then.

21  **IV.   DISCUSSION**

22  **A.    Legal Standard**

23  The Fourth Amendment protects the "right of the people to be secure in their persons,

24  houses, papers, and effects, against unreasonable searches and seizures." *See United States v. Place*,

25  462 U.S. 696, 701 (1983).  The Fourth Amendment does not forbid all searches and seizures, only

26  unreasonable ones. *Terry v. Ohio*, 392 U.S. 1, 9 (1968).

27  Before the court analyzes whether a search or a seizure is reasonable or unreasonable, there

28  Page 5 of  12

**United States District Court**
For the Northern District of California

1  must first be a "search" or a "seizure." *Yin v. State of Cal.*, 95 F.3d 864, 874 (9th Cir. 1996).  A

2  consensual encounter with an officer is not a "seizure of a person" that implicates Fourth

3  Amendment protections. *United States v. Mendenhall*, 446 U.S. 544, 555 (1980).  An exchange is

4  consensual if a reasonable person would feel free to walk away, decline to answer the officers'

5  questions, or otherwise terminate the encounter. *Id*.  As the Ninth Circuit explained:

6
7
8
9
> Law enforcement officers do not violate the [F]ourth [A]mendment by
> approaching an individual in a public place and putting questions to
> him or her.  The person so questioned need not answer any questions
> and is legally free to ignore the officer, or to walk away.  His or her
> voluntary answers to the officer's questions are admissible in a
> criminal prosecution.  The fact that the officer identifies himself as a
> police officer does not convert the encounter into a seizure requiring
> some level of objective justification.

10

11  *United States v. Woods*, 720 F.2d 1022, 1026 (9th Cir. 1983) (citations omitted).  If a police

12  encounter is not consensual, or if a consensual encounter at some point becomes nonconsensual, that

13  encounter may be a seizure that implicates the Fourth Amendment. *Terry*, 392 U.S. at 16.

14       The Government has the burden of proving that the encounter between McVey and the

15  agents was consensual. *Mendenhall*, 446 U.S. at 558.  The Government must prove the

16  voluntariness of the consent by a preponderance of the evidence. *United States v. Matlock*, 415 U.S.

17  164, 177 (1974).  Whether the consent given to search was freely and voluntarily given is a question

18  of fact to be determined by the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S.

19  218, 227 (1973).

20       "An individual may waive his Fourth Amendment rights by giving voluntary and intelligent

21  consent to a warrantless search of person, property, or premises." *United States v. Torres-Sanchez*,

22  83 F.3d 1123, 1130 (9th Cir. 1996).  A consent search is proper if it is freely and voluntarily given

23  and is not the result of duress or coercion. *Schneckloth*, 412 U.S. at 248-49.  A suspect may still

24  voluntarily give consent to search even though he or she has already been detained or arrested.

25  *United States v. Watson*, 423 U.S. 411, 424 (1976).

26       To determine whether a person voluntarily consented to a search, the court may consider, but

27  is not limited to considering, the following factors: (1) whether the defendant was in custody; (2)

28

**United States District Court**
For the Northern District of California

1    whether the arresting officers had their guns drawn; (3) whether Miranda warnings were given

2    before the search; (4) whether the defendant was told he had the right to withhold consent; and (5)

3    whether the officers claimed that they could obtain a search warrant.  *See Torres-Sanchez*, 83 F.3d at

4    1129 (citing *United States v. Castillo*, 866 F.2d 1071, 1082 (9th Cir. 1988)).  No one factor is

5    dispositive and the fact that some of the factors are not established "does not automatically mean

6    that consent was not voluntary."  *Torres-Sanchez*, 82 F.3d at 1130.

7    **B.      Analysis**

8             1.      Initial Encounter and Search of the Shopping Bags

9             In his Motion to Suppress, McVey first contends that the initial encounter between him and

10   the agents constituted an illegal detention because the Agents lacked reasonable suspicion to detain

11   him.  (Reply at 2.)  He further argues that the initial encounter amounted to an illegal seizure.  Citing

12   *United States v. Stevens*, 206 F.3d 914 (9th Cir. 2000), McVey argues that he "was singled out in a

13   crowded airport [], whereupon the two agents conveyed their authority by showing their badges, and

14   gave Claimant a Hobson's choice to either (1) stay and consent to questioning or (2) leave the airport

15   without his luggage and run the risk of giving agents reasonable suspicion to stop him."  (Reply at

16   6.)      As an initial matter, it is undisputed that McVey consented to the Agents' request to speak

17   with them and to the search of the two shopping bags in his possession.  Thus, to the extent that

18   McVey is arguing that the Agents needed reasonable suspicion to support either their contact with

19   him or their search of his shopping bags, the Court rejects such arguments.

20            As to McVey's argument that the Agents' initial contact with him in the outside ground

21   transportation area constituted an illegal seizure, the Court finds the evidence weighs against such a

22   finding.  As explained in greater detail below, the circumstances surrounding the Agents' contact

23   with McVey were such that a reasonable person would feel free to decline the Agents' requests or

24   otherwise terminate the encounter.  Particularly, the Agents approached McVey in public area in

25   plain sight of other people.  The Agents did not lead McVey outside to the ground transportation

26   area, but followed him there from the gate.  Thus, McVey was not cornered and his movement was

27   not restricted in any way.  When the Agents approached McVey, they were dressed in plain clothes

28                                                Page 7 of  12

**United States District Court**
For the Northern District of California

1   and did not have visible weapons.  They immediately identified themselves, spoke in a

2   conversational tone, and remained at a conversational distance from McVey.  The Agents also

3   informed McVey  that he was not under arrest and that he was free to leave.  Notably, after

4   identifying themselves, the Agents immediately asked McVey if he was wiling to speak to them.

5   Thus, there is no evidence suggesting that the Agents delayed requesting McVey's consent to talk to

6   them or otherwise attempted to intimidate him before requesting such consent.  It was only after he

7   consented to speak to the Agents that they proceeded to ask him for his identification and to ask him

8   questions about his trip, his criminal history, whether he was carrying any illegal drugs or large sums

9   of money in his shopping bags, and whether they could search those bags.

10         Further, the facts of this case are markedly different from those presented in *Stephens,* where

11  the bus passengers had few options to end the encounter with the officers.  Particularly, McVey's

12  argument that leaving the airport and abandoning his checked-baggage was his only option to

13  terminate the encounter with the Agents ignores the possibility that he could have withheld consent

14  to speak with the officers, moved to another location outside, or returned inside to the baggage

15  carousels.

16         Taking the foregoing facts into consideration, the Court rejects McVey's argument that the

17  Agents illegally seized him at the outside curb area.

18         McVey also asserts that, even if the initial contact was not an illegal seizure, as the agents

19  questioned him and followed him into the baggage claim area, the encounter became increasing

20  coercive and evolved into an illegal seizure.  (Reply at 8-9.)  In particular, McVey asserts that "at the

21  very least, [McVey] was seized when he was ordered to a more secluded area of the airport where

22  agents demanded a second consecutive search of [McVey's] baggage."  (Reply at 10-11.)  The

23  evidence, however, does not support McVey's argument.  After Agent Byrd completed a search of

24  McVey's shopping bags, Agent Maes asked McVey if he had any checked luggage, to which McVey

25  responded, "Yes."  At that point, McVey proceeded back into the baggage claim area to carousel 17.

26  Agent Maes and Agent Byrd followed him.  There is no evidence that Agent Maes or Agent Byrd

27  *instructed* McVey to retrieve his checked bag or *escorted* him back inside to the luggage carousel.

28                                        Page 8 of  12

**United States District Court**
For the Northern District of California

1    At carousel 17, McVey retrieved his suitcase, and confirmed to Agent Maes that it was his suitcase.

2    Agent Maes then *asked* McVey if they could move over to the other carousel, where it was less

3    crowded.  McVey agreed and - *own his own initiative* - rolled his suitcase over to carousel 16.

4    Again, there is no indication that Agent Maes or Byrd commanded McVey to move to carousel 16,

5    or otherwise restricted his movement.  In fact, Agent Byrd testified that while McVey was retrieving

6    his suitcase, he remained several feet behind Agent Maes and McVey.  Further, because the area

7    around carousel 17 was crowded, the Agents' interaction with McVey continued to be in plain sight.

8            After McVey and the Agents moved to carousel 16, McVey handed his suitcase to Agent

9    Byrd and sat on the empty carousel.  Carousel 16 was directly across from carousel 17, was open to

10   the public, and was in plain view.  Thus, contrary to McVey's characterization, carousel 16 was not a

11   secluded area.  While at carousel 16, McVey was not physically restrained in any way and the

12   Agents did not draw their weapons at any point.  Additionally, at carousel 16 Agent Maes again

13   informed McVey that he was not under arrest.

14           Considering these facts together, the Court finds that a reasonable person in McVey's

15   position would have continued to feel free to terminate the encounter.  McVey was therefore not

16   illegally seized at the baggage carousels.

17           2.       Consent to Search the Suitcase

18           McVey next contends that he never gave the Agents consent to search his suitcase.  He

19   argues that "[t]he only evidence offered by Plaintiff in the present case that purports to establish that

20   Claimant gave consent is the conclusory language in the DEA investigative report stating that TFA

21   Maes asked Claimant if SA Byrd could search his bag, whereafter, the report claims: 'McVey stated

22   'Yes.'" (Mot. at 9.)  However, as indicated above, both Agents testified that McVey consented to the

23   search of his suitcase, once while in the outside ground transportation area, and again while at

24   baggage carousel 17.  The pivotal question, therefore, is whether that consent was voluntary.

25           In his Motion, McVey asserts that, should the Court find that he gave consent to search his

26   suitcase, such consent was the product of coercion and was thus involuntary and invalid.  (Mot. at 9;

27   Reply at 11.)  The Government, however, contends that McVey freely and voluntarily consented to

28                                        Page 9 of  12

**United States District Court**
For the Northern District of California

1  the search.  The Court agrees with the Government.

2  　　　As indicated above, in evaluating whether consent was voluntary, the Court considers the

3  totality of the circumstances and specifically examines certain factors that courts have identified as

4  indicia of voluntariness. *See Mendenhall*, 446 U.S. 544, 554 (1980); *United States v. Crasper*, 472

5  F.3d 1141, 1146-47 (9th Cir. 2007).  Focusing first on these factors, the Court finds that they support

6  a  finding that McVey voluntarily consented to the search of his suitcase.

7  　　　First, as the Government points out, McVey was not in custody at any point during the

8  encounter with the Agents.  The Agents told McVey that he was not under arrest twice during the

9  encounter: first, during their initial contact with McVey on the curb, and again when they were at

10  carousel 16.  Agent Maes also informed McVey that he was free to leave.  McVey was not

11  physically restrained at any point, nor did the Agents restrict his path or movement.  Instead, both

12  Agents testified that they remained at a conversational distance from McVey and did not physically

13  touch McVey at any point.  The Agents asked to see McVey's plane ticket and identification, and

14  after reviewing both, immediately returned them to McVey.

15  　　　Second, the Agents did not have visible weapons and did not draw their weapons at any point

16  during their contact with McVey.  In the same vein, the Agents were dressed in plain clothes, not in

17  uniforms, thereby minimizing intimidation that could come from interacting with law enforcement

18  officials.

19  　　　Third, because McVey was not in custody, the Agents did not read *Miranda* warnings to him.

20  While McVey contends that the lack of *Miranda* warnings weighs against a finding of voluntariness,

21  the Court agrees with the Government that *Miranda* warnings are inapposite. *See United States v.*

22  *Rodriguez-Preciado*, 399 F.3d 1118, 1126 (9th Cir. 2005); *United States v. Ritter*, 752 F.2d 435, 438

23  (9th Cir. 1985).  Additionally, reading the warnings could have had given McVey the impression

24  that he was under arrest and potentially created a coercive situation.

25  　　　Fourth, the Agents did not tell McVey that they could obtain a search warrant if he refused to

26  consent to a search of his suitcase.  Thus, there is no evidence that the Agents gave McVey the

27  impression that withholding consent was useless.

28

**United States District Court**
For the Northern District of California

1       The fifth factor - whether the Agents notified McVey that he had a right not to consent -

2   weighs against a finding of voluntariness.  Specifically, both Agents testified that they did not advise

3   McVey that he did not have to consent to the search of his suitcase.  However, after Agent Byrd

4   discovered the defendant currency in McVey's suitcase and Agent Maes asked him about it, McVey

5   indicated that he did not want to answer any more questions.  This suggests that McVey was not

6   only aware that he could refuse to answer the Agents' questions, but actually exercised that right.

7       Thus, examining the foregoing factors used to assess voluntariness of consent, four out of

8   five of the factors support a finding the McVey's consent to search his suitcase was voluntary.

9       Additionally, several other factors are relevant to the Court's examination.  As described

10  above, the entire encounter between McVey and the Agents occurred in a public place and in plain

11  view.  Throughout the encounter, the Agents spoke to McVey in a conversation tone - there is no

12  evidence that the Agents yelled or addressed McVey in a threatening tone of voice.  The entire

13  encounter lasted between 10 to 15 minutes.  Thus, there is no evidence that the Agents prolonged the

14  encounter in an effort to wear McVey down so that he would consent.

15      At the same time, there are also several factors that cut against a finding that McVey's

16  consent was voluntary.  The Agents did not provide, and McVey therefore did not sign, a written

17  consent form.  Although the Agents informed McVey that he was free to go, it is undisputed that the

18  Agents did not tell McVey that he was "free to end the encounter."  Additionally, while at carousel

19  16, McVey asked the Agents for permission to use his cell phone, which suggests that he believed he

20  was restricted to some extent.  However, Agent Maes responded that he could use his phone and

21  McVey proceeded to make a call.  This then suggests that McVey felt free enough to go about

22  routine, somewhat personal, conduct in front of the officers while at carousel 16.

23      Taking the foregoing factors into consideration, the Court finds that they militate in favor of

24  a finding that McVey knowingly and voluntarily consented to the search of his suitcase.  The Court

25  therefore finds that the Government has met its burden of demonstrating that they obtained McVey's

26  consent to search his suitcase and that the consent was freely and voluntarily given.

27

28                                  Page 11 of  12

**United States District Court**
For the Northern District of California

3.      Scope of Consent

Finally, McVey contends that, even if the Court finds valid consent to search his suitcase was given, the Agents impermissibly expanded the scope of that consent with the search of his suitcase. (Mot. at 11; Reply at 18.)  Specifically, McVey contends that Agent Byrd impermissibly expanded the scope of any alleged consent by searching the shoes within the suitcase without seeking or obtaining consent.  (Mot. at 11-12.)  However, as the Government points out, McVey did not limit or otherwise qualify his consent to the Agents' search of his suitcase.  It was therefore objectively reasonable for the Agents to search the shoes within the suitcase.  Accordingly, the Court rejects McVey's argument. *See Florida v. Jimeno*, 500 U.S. 248, 251 (1991).

## V.  CONCLUSION

Based on an examination of the totality of the circumstances, the Court **DENIES** Claimant McVey's Motion to Suppress (Dkt. #21)  Further, the Court **DENIES** the Government's Motion in Limine (Dkt. #40) as moot.

**IT IS SO ORDERED.**

Dated: March 31, 2009

_____
MARIA-ELENA JAMES
United States Magistrate Judge